The COURIERS–SUSQUEHANNA, INC.

v.

COUNTY OF DAUPHIN, Harrisburg School District, and Dauphin County Board of Assessment Appeals.

Appeal of DAUPHIN COUNTY BOARD OF ASSESSMENT APPEALS.

Commonwealth Court of Pennsylvania.

Argued Dec. 9, 1996.

Decided April 4, 1997.

Reconsideration Denied May 30, 1997.

Carl G. Wass, Harrisburg, for appellant.

Allen C. Warshaw, Harrisburg, for appellee, Couriers-Susquehanna, Inc.

Before COLINS, President Judge, DOYLE, J., and LORD, Senior Judge.

DOYLE, Judge.

The County of Dauphin, Harrisburg School District, and Dauphin County Board of Assessment Appeals, appeal an order of the Court of Common Pleas of Dauphin County (Common Pleas), which granted Couriers–Susquehanna, Inc. (Couriers) a charitable exemption from the real estate tax.

**FACTUAL BACKGROUND**

Couriers is a nonprofit corporation created by a gospel singing group known as the Couriers. The singing group is composed of three ministers, Dwayne Nicholson, Philip Enlow, and Neil Enlow, who have been operating a music-based ministry since 1958 and have performed throughout the United States and in numerous foreign countries. They became a nonprofit corporation in 1972, under the corporate name The Great Commission Evangelistic Association. In 1991, the name of the corporation was changed to its present name, The Couriers–Susquehanna, Inc.

Couriers owns the Susquehanna Center Nursing Facility (Center), a nursing home located in Harrisburg, Dauphin County, Pennsylvania. Couriers purchased the Center in 1991 from a limited partnership that operated the nursing home as a for-profit business. As a business, the Center was subject to the real estate tax.

Couriers paid $7,775,000 for the Center, including its land, buildings, fixtures, and furniture. Couriers financed the sale by borrowing $9,300,000 from the Dauphin County Industrial Development Authority (Authority). To raise the funds for the loan to Couriers, the Authority issued bonds which were purchased by two investment houses, the Eaton Vance Fund of Boston, Massachusetts, and the Kemper Fund, of Chicago, Illinois. Couriers also executed two judgment notes: a $635,000 note to the prior owner of the Center, and a $390,000 note to National Development and Consultants, Ltd. With the exception of approximately $700.00 contributed by Nicholson and certain donations of personal property such as carpets, drapes, and Christmas trees, Couriers made no cash contributions at all to the purchase of the Center.[1]

The Center is a 180–bed facility that provides long-term nursing and medical services to elderly patients. The .Center's patients are usually referred to the Center by local hospitals; the patients are persons who no longer require the services of a hospital, but are unable to care for themselves. The Couriers have an open admissions policy at the Center and, under that policy, patients are admitted to the facility based solely on bed availability and the medical needs of the patient. The patient's ability to pay is not taken into consideration.

In 1992, approximately 75% of the Center's patient revenues were derived from government payments in the form of Medicaid, Medicare, and Veteran's benefits. That amount increased to 83% of patient revenues in 1994. Of the government third-party payers, Medicaid provides the largest portion of patient revenues: 60–62% in 1992, and 72% in 1994. Some of the Center's patients are "private payers," who use their own resources to finance their care; private payers, however, are overcharged by the Center to subsidize medical assistance patients.

The Center sustained a financial loss in 1991 of $311,000. Its losses increased in 1992 to $868,855, but declined to $400,000 in 1993. Although the individual members of the Couriers singing group had served as paid corporate directors, they no longer receive compensation. In 1991, the three received $42,000 in compensation, and in 1992 their combined income increased to $72,000. In 1993, while two of the directors stopped drawing a salary the remaining director, Nicholson, continued to draw a salary of $3,500 per month until sometime in 1994. All three together in 1993, received compensation in excess of $60,000.[2] That, of course, is no longer the situation.

## PROCEDURAL HISTORY

On July 24, 1991, Couriers petitioned the Dauphin County Board of Assessment Appeals (Board) to have the Center exempted from real estate taxes on the ground that it was a purely public charity. The Board denied Couriers' request for an exemption, and Couriers appealed that decision to Common Pleas.

After a hearing, Common Pleas denied Couriers' appeal and concluded that it was not entitled to a tax exemption for the Center. To resolve Couriers' appeal, Common Pleas applied the test articulated in *Hospital Utilization Project v. Commonwealth*, 507 Pa. 1, 487 A.2d 1306 (1985) (hereinafter identified as *HUP* ). In *HUP*, the Supreme Court identified the following five factors to be considered when determining whether a particular organization qualifies as a purely public charity:

  (a) Advances a charitable purpose;

  (b) Donates or renders gratuitously a substantial portion of its services;

1. Frank Caswell, a consultant employed by Couriers, testified that, although the Center's purchase price was slightly less than 8 million dollars, Couriers needed to borrow in excess of 10 million dollars to cover legal and administrative costs involved in completing the transaction.

2. Nicholson's testimony indicates that the annual salary figures were an aggregate of the salaries earned by all three of the directors. (Notes of Testimony, 10/5/94, at 67; Reproduced Record at 232a.) Further, Nicholson testified that, while two of the directors stopped receiving a salary in 1993, their salaries did not cease until the end of August of 1993. Hence, the two directors had received approximately two thirds of their 1993 salary before payments ceased. *Id.*

(c) Benefits a substantial and indefinite class of persons who are legitimate subjects of charity;

(d) Relieves the government of some of its burden; and

(e) Operates entirely free of the profit motive.

*Id.* at 22, 487 A.2d at 1317. Common Pleas determined that Couriers did not satisfy the *HUP* test and, thus, did not qualify as a pure public charity.

Further, Common Pleas applied Section 204 of the General County Assessment Law (Law),[3] which allows counties to confer, *inter alia,* a real estate tax exemption on institutions "founded, endowed, and maintained by public or private charity." Common Pleas determined that the Center was not founded or maintained by charity, because Couriers relied on public financing to purchase the institution and its primary source of income is the federal government.

Couriers appealed to this Court, which initially vacated Common Pleas' order and remanded the case for additional factual findings. *Couriers–Susquehanna, Inc. v. County of Dauphin,* 165 Pa.Cmwlth. 192, 645 A.2d 290 (1994) *(Couriers I).* In that appeal, this Court held that Couriers satisfied four of the five elements of the *HUP* test, but, because the record was not sufficiently developed, we could not determine if Couriers satisfied the fifth prong of the test —namely, whether Couriers operated entirely free of the profit motive. Hence, we remanded the matter. Our opinion did not discuss whether Couriers satisfied the requirements of Section 204 of the Law.

On remand, Common Pleas heard additional evidence and found as fact that Couriers did not accumulate any surplus monies and that the salaries received by the three directors was not excessive. Therefore, Common Pleas held that Couriers was a purely public charity and was, consequently, entitled to a tax exemption.

## ISSUES

Dauphin County, the Harrisburg School District, and the Board (hereinafter collectively referred to as the County) contend that Common Pleas erred in granting Couriers a charitable exemption for the Center because (1) the Couriers do not operate the Center free of the private profit motive and, thus, failed the *HUP* test, and (2) Couriers did not satisfy its burden under Section 204(a) of the Law to show that the Center was endowed and maintained by charity.

## DISCUSSION

Article 8, Section 2 of the Pennsylvania Constitution gives the General Assembly the power to exempt institutions of purely public charity from taxation. Based on that grant of authority, the General Assembly enacted Section 204 of the General County Assessment Law (Law), which allows counties to confer a real estate tax exemption on purely public charities.

■ To receive a charitable tax exemption, the organization must first qualify as an institution of purely public charity. To do so, the applicant must satisfy all five criteria of the *HUP* test *Associated YM–YWHA of Greater New York/Camp Poyntelle v. County of Wayne,* 149 Pa.Cmwlth. 349, 613 A.2d 125 (1992). An organization does not qualify as a purely public charity merely because it is a nonprofit corporation, and it is irrelevant whether the organization is recognized as a tax-exempt charity for federal income tax purposes. *Sacred Heart Healthcare System v. Commonwealth,* 673 A.2d 1021 (Pa. Cmwlth.1996). By satisfying the *HUP* test, the applicant demonstrates that it meets the minimum constitutional qualifications for being an appropriate subject of a tax exemption. *City of Washington v. Board of Assessment Appeals of Washington County,* 666 A.2d 352 (Pa.Cmwlth.1995), *petition for allowance of appeal granted,* 545 Pa. 672, 681 A.2d 1344 (1996).

However, qualifying as a purely public charity under the *HUP* test does not, by itself, establish that the applicant is eligible for a charitable tax exemption. *Id.* In order to receive a charitable exemption the organization must satisfy Section 204(a) of the Law,

**3.** Act of May 22, 1933, P.L. 853, *as amended,* 72  P.S. § 5020–204.

72 P.S. § 5020–204(a), which provides the following relevant standard for tax exempt real property:

> (a) The following property shall be exempt from all county, city, borough, town, township, road, poor, or school tax, to wit:
>
> . . . .
>
> (3) All hospitals, universities, colleges, seminaries, academies, associations and institutions of learning, benevolence, or charity . . . founded, endowed and maintained by public or private charity: Provided, That the entire revenue derived by the same be applied to support and to increase the efficiency and facilities thereof, and for no other purpose. . . .

### Does *Couriers I* limit the issues in this case?

Before determining whether Couriers satisfies the *HUP* test and Section 204 of the Law, we must consider a threshold issue raised by Couriers. Couriers contends that we are barred by the "law of the case doctrine" from considering any issue beyond the question presented to Common Pleas on remand from this Court in *Couriers I, i.e.,* whether Couriers operates the Center free of the profit motive. The County raises arguments asserting that Couriers does not donate a substantial portion of its services, does not relieve the government of its burden, and does not qualify for an exemption under Section 204 of the Law. In Couriers' view, the question of whether it satisfies the four remaining elements of the *HUP* test and the question of whether it complied with Section 204 of the Law were decided in *Couriers I* and, therefore, are outside the scope of this appeal and may not be relitigated.

The law of the case doctrine is a judicial rule that discourages a court, involved in later phases of a litigated matter, from reopening questions decided by another judge of the same court or a higher court in an earlier phase of the litigation. *Commonwealth v. Starr*, 541 Pa. 564, 664 A.2d 1326 (1995). The doctrine is designed to promote judicial economy, uniformity of decision making, protect the settled expectations of the parties, maintain the consistency of the litigation, and to end the case. *Id.* Specifically,

the doctrine applies in the following relevant circumstances:

> (1) [U]pon remand for further proceedings, a trial court may not alter the resolution of a legal question previously decided by the appellate court in the matter; [and] (2) upon a second appeal, an appellate court may not alter the resolution of a legal question previously decided by the same appellate court. . . .

*Starr* at 574, 664 A.2d at 1331. The law of the case doctrine, however, does not apply in the following circumstances: (1) where there has been an intervening change in the controlling law; (2) where there has been a substantial change in the evidence or facts giving rise to the litigation; or (3) where the prior ruling was clearly erroneous and would create a manifest injustice if followed. *Id.*

Our review of *Couriers I* reveals that this Court decided, as a matter of law, that Couriers satisfied the first four elements of the *HUP* test, and the law of the case doctrine precludes this Court from altering the resolution of a legal issue we decided in a prior appeal in the same case. *Starr.* Therefore, because another panel of this Court decided those questions, we must conclude that, under the law of the case doctrine, we may not reconsider in this appeal whether Couriers satisfied the first four elements of the *HUP* test.

With regard to Section 204 of the Law, however, it is clear from our opinion in *Couriers I* that we never decided whether Couriers qualified for a charitable tax exemption under that statute. Moreover, this Court could not have decided in *Couriers I* whether Couriers was entitled to an exemption under Section 204, because, before we may determine if an applicant qualifies for an exemption under Section 204 of the Law, the applicant must first successfully demonstrate that it is a purely public charity. Because the record was insufficient in *Couriers I* for us to determine whether Couriers was a purely public charity, any discussion in *Couriers I* of Couriers' right to an exemption under Section 204 would have been premature. Therefore, the law of the case doctrine does not preclude us from reaching the issue of Couri-

ers' right to a tax exemption under Section 204 of the Law.

### Does Couriers operate the Center free of the profit motive?

■ The County contends that Common Pleas erred in holding that Couriers operates the Center free of the profit motive. The County asserts the one of the founders of Couriers, Nicholson, is operating the Center in competition with other nursing homes so that the Center can continue to operate in spite of the burdensome debt Couriers incurred when purchasing the facility. Also, according to the County, when Couriers succeeds in paying off its indebtedness, the cash it spends on the interest on its debt ($1,122,-247 in 1992) will be available to Couriers. Furthermore, the County claims that, while the Center's financial records ostensibly show that the Center is being operated at a loss, it is, in fact, generating a surplus. Hence, despite the fact that Couriers claims that the Center has been losing money ($311,000 in 1991, $868,855 in 1992, and $400,000 in 1993), it does not operate free of the profit motive.

■ To determine if an organization is free of the profit motive, this Court looks to, *inter alia*, whether the organization made a profit or whether excessive salaries and fringe benefits are paid to corporate officers. *St. Margaret Seneca Place v. Board of Property Assessment, Appeals and Review, County of Allegheny*, 536 Pa. 478, 640 A.2d 380 (1994). Other factors suggesting that an entity operates with a profit motive include providing services to for-profit businesses, making loans at market interest rates, and owning for-profit subsidiary corporations. *Sacred Heart.* When an organization has a surplus of revenue and reinvests that money into the maintenance and operation of its facility, the surplus revenue does not constitute private profit. *Id.; West Allegheny Hospital v. Board of Property Assessment, Appeals, and Review,* 500 Pa. 236, 455 A.2d 1170 (1982).

While the record does indicate that Couriers is competing with other nursing facilities to remain financially solvent, the evidence does not support the County's argument that Nicholson is operating the nursing home in order to reap a windfall in profits after the Center's heavy debt is satisfied. It is true that, after the massive debt Couriers incurred when purchasing the Center is finally satisfied, the Center's financial well being could dramatically improve. However, Couriers has not paid off its debt and, even assuming it does and its income substantially increases, the increase would not constitute profit if it was reinvested into the Center. *St. Margaret Seneca.* Therefore, this argument must fail.

■ With regard to Couriers' financial condition, the County points to the testimony of a management consultant hired by Couriers, who stated that he expected the Center's deficit in 1993 to be $400,000, which is approximately $470,000 less than its deficit in 1992. The County asserts that this shows that Couriers expects to receive a profit. We disagree. While that testimony demonstrates that Couriers' financial condition substantially and rapidly improved from 1992 to 1993, a corporation is not required to prove that it is insolvent or on the brink of bankruptcy to satisfy the *HUP* test. An entity is permitted to receive enough revenue to keep it in operation, so long as it does not go beyond self-support. *HUP; Episcopal Academy v. Philadelphia,* 150 Pa. 565, 25 A. 55 (1892). Because, in our view, an organization can be financially healthy and operate free of the profit motive, we reject this argument.

The County also claims that Couriers' 1992 balance sheet, through creative accounting, is obscuring the fact that Couriers has a positive cash flow. Although the 1992 balance sheet reports a loss of $868,855, the County asserts that three types of expenses listed on that balance sheet are improper and must be subtracted from the deficiency calculated for that year: (1) "bad debt expense"; (2) the real estate tax expense; and (3) depreciation and amortization. The County argues that the "bad debt expense" ($263,069) must be excluded, because that expense reflects the net estimated realized amounts from residents and third-party payers, subject only to future adjustments in Medicare and Medicaid payment, and does not represent a cash re-

duction. The real estate tax expense ($273,-809), in the County's view, must be excluded because Couriers did not pay such taxes. Depreciation and amortization is an attempt to recapture the value of an investment, and the amount claimed by Couriers for that expense ($427,284) cannot, therefore, be considered lost revenue. Excluding those expenses from the loss reported for that year results in a positive cash flow of $95,307 for 1992 (total of "improper" expenses for 1992, $964,162, minus reported loss of $868,855 = $95,307).

■ However, even if we accepted the County's argument that Couriers' income exceeded its expenses in 1992, a charity is not converted into a profit-making entity merely because it runs a surplus. *St. Margaret Seneca Place; Sacred Heart* (where a hospital had surplus earnings in excess of three million dollars over three years, that fact, by itself, did not indicate that the hospital had a profit motive). The County does not argue in this appeal that Couriers is failing to reapply the alleged surplus monies to the maintenance and operation of the Center, the crucial factor distinguishing a permissible surplus from a profit. Thus, we conclude that, even assuming Couriers had a $95,000 surplus in 1992, the surplus alone does not prove that Couriers has a profit motive.

The County argues that the hidden surplus made it possible for the directors of Couriers to receive compensation. However, the receipt of compensation by the three directors, in itself, does not render Couriers a profit-making entity. And, of critical importance, the County does not argue that the salaries drawn by the members of the Couriers singing group are excessive. The Board does argue in the Summary of the Argument portion of its brief that the members provided little or no services for the salaries they drew from the corporation, but that argument was not developed in the argument portion of the Board's brief. Nevertheless, we note that the record shows that Nicholson worked approximately 15 days per month on Center business; in fact, the County stresses in its argument that Nicholson is working diligently to make the Center profitable. The other two members of the singing group expended

their time visiting the patients in the Center, interacting with resident's families, and performing gospel singing at the Center. We do not believe that those services are valueless. In addition, all the members of the Couriers have stopped receiving salaries from Couriers.

Therefore, for all the above reasons, we hold that Common Pleas correctly determined that Couriers operates free of the profit motive and, considering our decision in *Couriers I*, we must further hold that Couriers is a purely public charity.

## Is Couriers entitled to a tax exemption under Section 204 of the Law?

■ Although Couriers is a purely public charity under the *HUP* test, it must nonetheless meet the requirements of Section 204 of the Law in order to qualify for an exemption from the real estate tax. The party seeking such an exemption bears a heavy burden of proving that it is deserving of a tax exemption, *Appeal of Capital Extended Care*, 148 Pa.Cmwlth. 128, 609 A.2d 896 (1992), and tax exemption statutes, like Section 204 of the Law, must be strictly construed. Section 1928(b)(5) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1828(b)(5).

■ Section 204(a)(3) establishes three criterion for determining if a charity qualifies for a tax exemption: (1) the institution must be one of purely public charity; (2) was founded by public or private charity; and (3) is maintained by public or private charity. *Woods Schools Tax Exemption Case*, 406 Pa. 579, 178 A.2d 600 (1962).

The County contends that Couriers is not an institution founded, endowed, or maintained by public or private charity, and, therefore, does not qualify for an exemption under Section 204 of the Law. The County observes that Couriers purchased the Center entirely by loans and that there was no "seed money" provided by any public or private charity. There is no evidence of any endowment fund, and the Center is operated exclusively through the receipt of government payments and fees paid by private pay patients. We are constrained to agree.

The record reveals that Couriers placed, at most, $700.00 in cash and certain items of personal property toward the purchase of the Center. The remaining $10,000,000 was generated by a combination of bonds issued by the Dauphin County Industrial Development Authority, which were purchased by investment bankers, and certain judgment bonds issued to private businesses. While we have held that a nursing home may qualify for a tax exemption even if it was purchased using a substantial amount of borrowed funds, *Mt. Macrina Manor, Inc. v. Fayette County Board of Assessment Appeals,* 683 A.2d 935 (Pa.Cmwlth.1996), Couriers acquired the Center by financing virtually 100% of the purchase price through government and for-profit lenders. There is no evidence that any meaningful charitable contributions, from Couriers or any other charity, were used to acquire the Center. Therefore, we conclude that the Center was not founded by public or private charity.

Moreover, the Center is maintained by a combination of government benefits and direct payments from patients, and there is no evidence of an endowment to support the operation of the Center. Further, the record does not reveal that Couriers receives any significant charitable contributions for the maintenance of the Center. Hence, the Center is not maintained by charity.

Couriers, however, alleges in its brief that it received one cash donation of $200,000, when the National Development Corporation forgave part of its debt. The County counters on the other hand, that Couriers simply never paid that loan, causing the debt to balloon. The loan forgiveness is merely a way for the lender to write off a bad debt and cover its losses; thus the County argues that the loan forgiveness cannot be construed to be a donation.[4] Nonetheless, considering that the Center costs millions of dollars per year to operate [5] and, at the time of the 1994 hearing, the Center was owned by Couriers for approximately three years, a single $200,-000 donation, in our view, is not sufficient to demonstrate that the Center is maintained by charity.

Couriers further argues that it is maintained by charity because, in 1993, volunteers provided labor that would have cost Couriers over $60,000 if it had to hire employees to do that work. However, while the work of the volunteers is laudable, after comparing the value of their work to the cost of operating the Center, we are constrained to conclude that services donated by the volunteers are not of such significance to show that the Center is maintained by charity.

Therefore, in light of the above, we hold that Couriers does not qualify for a tax exemption under Section 204(a) of the Law.

## CONCLUSION

Although Common Pleas correctly determined that Couriers satisfied the *HUP* test and meets the constitutional requirement to be a purely public charity, Couriers does not qualify for a tax exemption under Section 204(a) of the Law. Accordingly, Common Pleas' order is reversed.

## *ORDER*

NOW, April 4, 1997, the order of the Court of Common Pleas of Dauphin County in the above-captioned matter is hereby reversed.

---

4. We note that the loan in question was for $390,000 and was part of the financing package Couriers assembled to purchase the Center. And, because Couriers failed to make payments on that loan, its debt swelled to such a degree that the $200,000 loan forgiveness only reduced the face value of the loan to approximately $363,-000.

5. The Center's operational expenses in 1991 were $3,296,159; that number increased to $7,278,876 in 1992. (Couriers' Exhibit 10 at 4.)