COMMUNITY GENERAL OSTEOPATHIC HOSPITAL, Appellant

v.

DAUPHIN COUNTY BOARD OF ASSESSMENT APPEALS, County of Dauphin, Lower Paxton Township and Central Dauphin School District.

COMMUNITY GENERAL OSTEOPATHIC HOSPITAL

v.

DAUPHIN COUNTY BOARD OF ASSESSMENT APPEALS, County of Dauphin, Lower Paxton Township and Central Dauphin School District.

Appeal of County of Dauphin, Appellant.

Commonwealth Court of Pennsylvania.

Argued April 11, 1997.

Decided Jan. 26, 1998.

Reargument Denied March 12, 1998.

Allen C. Warshaw, Harrisburg, for appellant.

Kenneth D. Chestek, Erie, for appellee, County of Dauphin.

Before DOYLE and FRIEDMAN, JJ., and JIULIANTE, Senior Judge.

DOYLE, Judge.

Community General Osteopathic Hospital (Community) and the Dauphin County Board of Assessment Appeals, County of Dauphin, Lower Paxton Township, and the Central Dauphin School District (County), cross appeal from two orders of the Court of Common Pleas of Dauphin County. The first order, issued on March 23, 1995, granted Community's petition to remove its property from the tax assessment rolls for 1993 and fiscal year 1993–94, but denied Community's request to have its tax exempt status reinstated for subsequent years. The second order, issued on May 24, 1996, denied Community's appeal from an order of the Dauphin County Board of Assessment Appeals, and, thereby, affirmed the County's revocation of Community's tax-exempt status. Community appeals from both of the Common Pleas Court's orders; the County, however, appeals from the March 23, 1995 order only.

## FACTUAL BACKGROUND

Common Pleas made extensive findings of fact in its opinion in *Community General Osteopathic Hospital v. Dauphin County Board of Assessment Appeals*, No. 5084 3 1993 (C.P. Dauphin May 24, 1996), dated May 24, 1996, which may be generally summarized as follows:

### History and Community Services

Community is a 157 bed teaching hospital located in Lower Paxton Township, Pennsylvania, and within the Central Dauphin School District. The hospital was originally founded in 1945 through public and private contributions and charity. Since its creation, Community has been exempt from state and federal taxes.

Structurally, Community is a Pennsylvania non-profit corporation organized on a non-stock basis. The hospital's corporate by-laws provide in pertinent part that Community is

organized for the support of a benevolent and charitable undertaking, to wit: The establishment, maintenance, and management of an eleemosynary Hospital and related services for the care and treatment of the sick and injured; without respect to race, color, creed or financial status....

(Common Pleas' Opinion, Finding of Fact 5.) Community's articles of incorporation state that no officer, trustee, or private person may receive any part of its net earnings, except that Community is permitted to pay reasonable compensation for services rendered.

In accordance with the above, Community maintains an open admissions policy, and no person has ever been denied necessary medical care by Community, nor has the hospital ever denied a person admission to the hospital because they could not afford to pay. Community has a written policy governing financial assistance to needy patients who are unable to pay the full cost of their medical treatment, and actively seeks to identify those who may be eligible for such assistance. Financial assistance is given to patients ineligible for Medicaid and Medicare, but who are legitimately unable to pay their

bills. There is no policy which limits the amount of financial assistance Community would grant to needy patients in any given year.

Further, despite the fact that Community is aware that it will not be paid for some of its services, it nevertheless provides medical care to anyone who walks in the door. Community often simply forgives charges incurred by patients unable to pay for needed services. Unpaid charges are written off as bad debts.

A majority of the patients at Community are insured through the Medicare [1] and Medicaid [2] programs. With regard to Medicaid, from 1992 through 1995, the payments Community received under those programs fell short of the actual cost of services to Medicaid patients. Similarly, for three of the four years between 1992 and 1995, Medicare payments to Community fell short of reimbursing Community for the costs of treating Medicare patients.

In addition to donating medical care, Community donates money to local charities and provides free health service, more specifically, health screenings, the publication of free booklets, and the operation of health clinics. Community also offers free educational programs for health professionals.

### Corporate Structure and Financial Status

In 1987, Community reorganized its corporate structure to limit the activities of Community to providing patient care and to move other functions outside of the hospital to other entities. As a result of that reorganization, Community's corporate structure includes the hospital, the Community General Osteopathic Hospital Foundation, Inc. (Foundation), which acts as the parent corporation, and two subsidiaries of the Foundation, Arlington Services, Inc. and Londonderry Properties, Inc.

Although the foundation was first formed in 1969 to aid in fundraising for Community, it became the parent corporation in 1987 and began to control the hospital through an interlocking board of directors. Community transferred $500,000 to the Foundation to capitalize its new corporate parent. Shortly after the restructuring, the Foundation formed Arlington Services and Londonderry Properties. Arlington Services is a for-profit corporation that owned an interest in a laboratory and a MRI facility. Londonderry Properties is a non-profit, tax exempt, real estate holding company. Although Londonderry Properties purchased a medical office building near Community in 1990, that purchase was financed through a mortgage from a commercial bank; the mortgage was not guaranteed by Community or the Foundation.

The aforementioned corporate structure is graphically illustrated by the following organizational chart:

---

1. Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395–1395ccc. Medicare is a health program designed, primarily, to furnish medical care to persons over sixty-five years of age.

2. Title XIX of the Social Security Act, 42 U.S.C. §§ 1396–1396v. Medicaid is a federal program intended to provide health care to any person, regardless of age, who needs financial assistance to purchase health care services.

P:

In order to market itself as an outpatient provider, Community has also been purchasing existing medical practices, or developing new practices, and operating them as part of the hospital. Community currently operates ten such family practices; seven were purchased from private physicians and three were developed by Community. Four of the practices are located in rural areas underserved by other medical providers. Because the clinics are part of the hospital, Community's charitable care policy applies to those practices, requiring the treatment of persons without regard to their ability to pay. When Community buys a practice, the selling physician generally becomes an employee of Community and continues to serve the same patients in the same, or nearby, location. Community pays the salaries of the physician and the support staff and bills patients for services rendered. Physicians employed by Community at the family practices have covenants not to compete in their employment contracts which preclude a physician from practicing for a certain period of time in a certain geographical area in the event he or she resigns or is terminated. Community pays its physicians additional consideration for entering into the covenant.

With regard to Community's financial condition, from 1992 through 1995, the hospital had an excess of revenue over expenses for each year except 1995, when it incurred a deficit of $620,817. Specifically, Community had the following surplus revenues: $736,076 in 1992; $545,331 in 1993; and $1,181,007 in 1994. During 1995, Community spent almost $4,700,000 on property and equipment, and that amount included the cost of purchasing six of its ten family medical practices. Community also received charitable contributions in the following amounts: $43,849 in 1992; $85,883 in 1993; $35,275 in 1994; and $76,615 in 1995.

### PROCEDURAL HISTORY

In 1992, the County determined that the tax exempt status of various institutions in the County should be reexamined. In particular, the County wished to reconsider whether hospitals (including Community), nursing homes, and other health care agencies were entitled to exemptions from the real estate tax. Although Community had been exempt from local real estate taxes for many years, on January 11, 1993, it received a letter from the County, written by the Director of the County's Office of Tax Assessment, William Collins, notifying Community that its property would be placed on the tax rolls, effective January 1, 1993. The letter was accompa-

nied by assessment notices changing the tax status of Community's parcels of land from exempt to taxable.

Community challenged the revocation of its exempt status in an appeal before the County's Board of Assessment Appeals, which, after conducting hearings on the matter, denied the appeal on October 28, 1993.

Thereafter, Community appealed the Board's decision to Common Pleas, asserting that it is a purely public charity entitled to an exemption from the real estate tax.

After the parties engaged in discovery, Community, collaborating with Harrisburg Hospital and Polyclinic Hospital, filed a "Petition to Remove Property from the Assessment Rolls and to Strike Tax Assessment" with Common Pleas. The petition asserted that Director William Collins improperly revoked Community's tax exempt status on his own authority, following instructions from a single County Commissioner, Anthony Petrucci. In Community's view, the power to remove tax exemptions is in the exclusive province of the County's Board of Assessment Appeals; the revocation, therefore, was invalid *ab initio.*

On March 23, 1995, the Common Pleas Court granted Community's petition in part. The court concluded that Director Collins improperly revoked Community's tax exemption, because the Board of Assessment Appeals was not involved in the decision to change Community's tax exempt status. Under Sections 3 and 7 of what is commonly known as the Third Class County Assessment Law (Assessment Law),[3] in Common Pleas' view, the local board of assessment appeals is granted the power to eliminate charitable tax exemptions. The Common Pleas Court determined that Mr. Collins did not have the independent power to vacate the tax exemption and, in light of the fact that County Commissioners have no authority to grant or revoke tax assessments or someone's tax status, Commissioner Petrucci could not delegate any authority to Mr. Collins. Despite the procedural irregularities of Mr. Collins' revocation, the Common Pleas

Court limited the impact of that error to the year 1993 only, reasoning as follows:

> The [County] maintain[s] that any procedural irregularities that resulted from the January 11 notice, or the conduct of the Director acting sua sponte on the exemption, only affect placing the hospital parcels on the tax rolls for 1993. This Court agrees. The letter of January 11, 1993 when combined with the extensive hearings held before the Board on each of the appeals as well as the ratification and endorsement of the Director's actions by the Board in denying the appeals ... can be construed as adequate notice to place [Community's] parcels on the 1994 tax rolls.

*Harrisburg Hospital v. Board of Assessment Appeals of Dauphin County,* 115 Dauph. 106, 115 (C.P.Pa.1995).

With regard to the merits, Common Pleas rejected Community's claim that it was a purely public charity and concluded that the hospital was not, therefore, entitled to a real estate tax exemption. To resolve Community's appeal, Common Pleas applied the test articulated in *Hospital Utilization Project v. Commonwealth,* 507 Pa. 1, 487 A.2d 1306 (1985) (hereinafter identified as *HUP* ). In *HUP,* the Supreme Court identified the following five factors to be considered when determining whether a particular organization qualifies as a purely public charity:

(a) Advances a charitable purpose;

(b) Donates or renders gratuitously a substantial portion of its services;

(c) Benefits a substantial and indefinite class of persons who are legitimate subjects of charity;

(d) Relieves the government of some of its burden; and

(e) Operates entirely free from private profit motive.

*Id.* at 22, 487 A.2d at 1317. Although the Common Pleas Court found that Community satisfied the first four prongs of the *HUP* test, it determined that the hospital does not operate free of the private profit motive. Common Pleas observed that the family practices purchased by Community are sub-

3. Act of June 26, 1931, P.L. 1379, *as amended,* 72 · P.S. § 5344 and § 5348.

sidized by the hospital and are not operated any differently than for-profit medical practices and show a profit motive. The non-competition covenants in the employment contracts of the family practice physicians, in the court's view, was further evidence of a profit motive. The Common Pleas Court also noted that funds were diverted from Community to the Foundation, and the operation of Londonderry Properties was also indicative of a profit motive. These appeals followed.

### ISSUES PRESENTED

Community contends that Common Pleas erred in holding that it did not operate free of the profit motive and, thus, did not qualify as a purely public charity under *HUP*. Further, as to the March 23, 1995 order, Community contends that Common Pleas erred in granting its petition to remove its property from the tax rolls in part, reinstating the tax exemption for 1993 only, because the hospital's tax exempt status was never properly revoked under the Assessment Law, and because it did not receive proper notice of the revocation.

The County, in its cross appeal challenging the March 23rd order, contends that Common Pleas erred in holding that the County improperly placed the Community's real estate on the assessment rolls in 1993.

### DISCUSSION

We begin our review by again observing that Article 8, Section 2, of the Pennsylvania Constitution gives the General Assembly the power to exempt institutions of purely public charity from taxation. Based on that grant of authority, the General Assembly enacted Section 204 of the General County Assessment Law (Law),[4] which confers a tax exemption on property owned by organizations determined to be pure public charities under certain circumstances. It is these two polestars which determine our judicial direction.

■ To receive a charitable tax exemption, the organization must first qualify as an institution of purely public charity. To do so, the applicant must satisfy all five criteria of the *HUP* test. *Associated YM–YWHA of Greater New York/Camp Poyntelle v. County of Wayne*, 149 Pa.Cmwlth. 349, 613 A.2d 125 (1992). An organization does not qualify as a purely public charity merely because it is a non-profit corporation, and it is irrelevant whether the organization is recognized as a tax-exempt charity for federal income tax purposes. *Sacred Heart Healthcare System v. Commonwealth*, 673 A.2d 1021 (Pa. Cmwlth.1996). By satisfying the *HUP* test, the applicant demonstrates that it meets the minimum constitutional qualifications for being an appropriate subject of a tax exemption. *City of Washington v. Board of Assessment Appeals of Washington County*, 666 A.2d 352 (Pa.Cmwlth.1995), aff'd, —— Pa. ——, 704 A.2d 120 (1997).

■ However, qualifying as a purely public charity under the *HUP* test does not by itself establish that the applicant is eligible for a charitable tax exemption. *Id.* In order to receive a charitable exemption, the organization must satisfy Section 204(a) of the Law, 72 P.S. § 5020–204(a), which provides the following relevant standard for tax exempt real property:

(a) The following property shall be exempt from all county, city, borough, town, township, road, poor, and school tax, to wit:

. . . .

(3) All hospitals, universities, colleges, seminaries, academies, associations and institutions of learning, benevolence, or charity ... founded, endowed and maintained by public or private charity: Provided, That the entire revenue derived by the same be applied to support and to increase the efficiency and facilities thereof ... and for no other purpose....

72 P.S. § 5020–204(a).

### The procedural issue:
### The March 23, 1995 order

We first consider the County's and Community's appeals from the Common Pleas' March 23, 1995 order, which removed Community's property from the tax rolls for 1993 only.

4. Act of May 22, 1933, P.L. 853, *as amended*, 72 P.S. § 5020–204.

Both Community's and the County's challenges to the March 23rd order focus on the procedures underlying Mr. Collins' January 11, 1993 order, and the challenges raised in this appeal are identical to those we reviewed in *Pinnacle Health Hospitals, Successor by Merger to Harrisburg Hospital v. Dauphin County Board of Assessment Appeals,* —— A.2d ——, 1998 WL 24211 (Pa.Cmwlth.1998) (*Harrisburg Hospital*), and *Pinnacle Health Hospitals, Successor by Consolidation to Polyclinic Medical Center v. Dauphin County Board of Assessment Appeals,* 708 A.2d 845 (Pa.Cmwlth.1998) (*Polyclinic*). Therefore, for the same reasons we articulated in *Harrisburg Hospital* and *Polyclinic,* this Court will affirm the Common Pleas Court's March 23rd order.

### The Substantive Issue:
### Is Community Entitled to a Charitable Exemption?

Community contends that the Common Pleas Court erred in holding that it did not sustain its burden of proving that the hospital operated entirely free of the profit motive, and that Community was not a purely public charity under the *HUP* test.

Initially, we note that the Common Pleas Court held that Community satisfied the first four prongs of the *HUP* test. Although the County argues in its brief that Community fails all five elements of the *HUP* test, the County did not cross appeal from that part of Common Pleas' decision. Therefore, we will limit our analysis to the issue of whether Community operates entirely free of a profit motive.

■ To determine if an organization is free of the profit motive, one indicia to establish or deny that element is whether the organization made a profit or whether excessive salaries and fringe benefits are paid to its corporate officers. *St. Margaret Seneca Place v. Board of Property Assessment, Appeals and Review, County of Allegheny,* 536 Pa. 478, 640 A.2d 380 (1994). Other factors would include providing services to for-profit businesses, making loans at market interest

rates, and owning for-profit subsidiary corporations. *Sacred Heart.* When an organization has a surplus of revenue and reinvests that money into the maintenance and operation of its own facility, however, surplus revenue does not constitute private profit. *Id.;* *West Allegheny Hospital v. Board of Property Assessment, Appeals, and Review,* 500 Pa. 236, 455 A.2d 1170 (1982). But, the diversion of surplus monies by an organization into **other entities** that are not operated free of the profit motive, **is** evidence of a profit motive. *Harrisburg Hospital.*

■ Community contends that the Common Pleas Court erred in concluding that it was not entirely free of the profit motive. The Court's holding that Community had a profit motive was based on the diversion of monies from Community to its related corporations and Community's operation of its family medical practices. Community, however, asserts that the record shows that it has not transferred substantial monies to related corporations, and that the family medical practices are part of the hospital and are operated under its strict open admission policies. In this respect we must agree with Community.

The record does not reveal a continuous flow of money from Community to related corporations. The *only* transfer of funds from Community to the Foundation occurred in 1986, when Community, as part of its corporate reorganization, transferred $500,000 to capitalize the Foundation as its new corporate parent. That transfer took place long before the County revoked Community's tax exempt status, and, in our view, is too remote in time to constitute evidence of a profit motive. Moreover, the record, instead of showing that Community was moving its cash outside of the hospital to related corporate entities, demonstrates that Community has been reinvesting the cash into its hospital facilities. Community, during the five-year period ending on June 30, 1994, used over ninety percent of its cash to purchase property and equipment. (Tax Exemption Litigation Report of Richard Drobnicki at 18.)

We recognize that the funds Community transferred to the Foundation in 1986 were

used, in part, to capitalize Arlington Services, a for-profit corporation. However, that entity has become inactive and its business ventures were ultimately liquidated. In fact, the record shows that the only asset presently retained by Arlington Services is a bank account containing $26,000, which the corporation maintains to cover its tax liability. The Foundation also used a portion of Community's capitalization transfer to create Londonderry Properties. That affiliated corporation purchased a medical office building in 1990 near Community. However, the record shows that the purchase of that building was mortgaged though a commercial bank; Community did not guarantee that loan. *Furthermore, the $500,000 transferred to the Foundation, was repaid to Community in full in 1991, and there is no evidence of any additional transfers from Community to the Foundation or any direct transfers of funds between Community and Arlington or Londonderry.*

Community's financial relationship with the Foundation stands in stark contrast to the facts in *Harrisburg Hospital* and *Polyclinic*, where the record showed that those institutions transferred millions of dollars, during years relevant to the taxes at issue, to related corporations which exhibited a profit motive. Compared to the transactions in the above cases, Community's transfer of $500,000 to the Foundation, is insignificant.

In light of the above, we conclude that Community's financial connection to its related corporations does not indicate that the hospital has a profit motive.

Our review of the operation of the family medical practices also fails to reveal a profit motive. Community's family practices are part of the hospital itself and are not operated by a related corporation. Because they are part of Community, the medical practices are governed by Community's open admission policy, which requires the treatment of individuals without regard to their ability to pay. Four of Community's practices are located in areas where there are few physicians and that are underserved by medical care. They are not in competition with the practices of other physicians. Also, the practices are located in areas where Community

is providing the only available osteopathic physician. Community has lost money operating the medical practices since their inception.

In view of the above, Community's medical practices are very different from medical offices operated as for-profit businesses. The fact that Community made the practices part of the hospital, subject to its open admission policy, and located some of its practices in underserved rural areas, strongly militates against the conclusion that Community has a profit motive. If Community had a profit motive, it could have created a subsidiary corporation to run the practices and completely have avoided Community's open admission requirements. Further, although Common Pleas believed that Community operates the practices to ensure a constant flow of patients, there is testimony in the record that Community did not open the practices merely to fill hospital beds, but rather was interested in providing care "close to the people." (Notes of Testimony (N.T.), 10/17/95 at 166–67; Reproduced Record (R.R.) at 97a–98a.) The record is devoid of evidence showing how many patients from the family practices are referred to the hospital or how much money was charged to such patients. Similarly, the fact that Community lost money running the practices is not evidence of a profit motive, since the deficits were a direct loss to the hospital and there is no evidence that the losses were incurred to increase patient flow into the hospital, or that the losses were offset by charges to those patients who would, absent a referral from the practice, not be patients of Community. *Cf. Polyclinic* (while the hospital covered $600,000 in losses incurred by medical practices, it charged $6,700,000 to patients referred to the hospital by those practices).

■ However, like the hospitals in *Harrisburg Hospital* and *Polyclinic*, the physicians employed in Community's family medical practices entered into covenants not to compete. Although such covenants are at odds with the mission of a charitable hospital and may suggest a profit motive, we do not believe that such covenants, by themselves, are sufficient to demonstrate that a hospital is

not entirely free of the profit motive. *See Harrisburg Hospital.* If the covenants not to compete are the only evidence suggesting a profit motive in the operation of Community's practice, we cannot, on those grounds alone, conclude that Community is not entirely free of a profit motive.

Therefore, we hold that Community is entirely free of the profit motive and, thus, under *HUP*, is a purely public charity.

### Section 204 of the Law: Is Community entitled to a tax exemption?

■ Because Community is a purely public charity under *HUP*, to qualify for an exemption from the real estate tax, it must nonetheless satisfy the requirements of Section 204 of the Law. *The Couriers–Susquehanna, Inc. v. County of Dauphin,* 693 A.2d 626 (Pa.Cmwlth.1997) (*Couriers II* ). The party seeking such an exemption bears a heavy burden of proving that it is deserving of a tax exemption, *Appeal of Capital Extended Care,* 148 Pa.Cmwlth. 128, 609 A.2d 896 (1992), and tax exemption statutes, like Section 204 of the Law, must be strictly construed. Section 1928(b)(5) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1928(b)(5). Although the Common Pleas Court did not consider Section 204 of the Law, and could not in light of its conclusion that Community failed the *HUP* test, *Couriers II,* the Court's findings of fact are sufficient for us to address this issue and, accordingly, we need not remand the case for further consideration by Common Pleas. *See City of Washington.*

■ Section 204(a)(3) establishes three criteria for determining if a charity qualifies for a tax exemption: (1) the institution must be one of purely public charity; (2) it must have been founded by public or private charity; and (3) it must be maintained by public or private charity. *Woods Schools Tax Exemption Case,* 406 Pa. 579, 178 A.2d 600 (1962).

Considering that it satisfied the *HUP* test, Community is deemed to be an institution of purely public charity. Further, it is clear from the record that Community was founded in 1945 by a combination of public and private charity. Community and the County, however, dispute the third element of the *Woods* test: whether Community is maintained by charity.

■ Generally, in order to find that an institution is maintained by charity, the institution must show that it receives significant charitable contributions. *Couriers II.* However, an institution need not be fully maintained by charitable contributions to be deemed to be maintained by charity. *Mt. Macrina Manor, Inc. v. Fayette County Board of Assessment Appeals,* 683 A.2d 935 (Pa.Cmwlth.1996). So long as an institution is partially funded by charity and any surplus revenues it receives are used to operate the facility or are placed in a surplus fund for future use, the institution is maintained by charity. *Id.; West Allegheny Hospital* (where an institution had revenues derived from patient billings and reinvested those funds in the charity's facilities, the institution was supported and maintained by public charity).

■ In the instant case, Community received the following charitable contributions from the Foundation: $540,282 in 1991; $43,849 in 1992; $85,883 in 1993; $35,275 in 1994; and $76,615 in 1995. (Common Pleas' Opinion, Finding of Fact No. 67; Report of Drobnicki at 24.) Furthermore, the financial report prepared by the County's expert stated that Community receives significant amounts of donated services. "Donated services" is the fair market value of services volunteers give to Community. Those amounts are as follows: $154,145 in 1991; $167,474 in 1992; $155,505 in 1993; and $142,585 in 1994. (Report of Drobnicki at 24.) In addition, Community had a special fund raising effort in 1985 that produced over $1,700,000, which was either immediately donated in cash or pledged to be paid over a term of years, generally five to seven years; the last pledge payments were made in 1994. (N.T., 10/18/95, at 5–6; R.R. at 135a.)

In addition, the record shows that Community has been reinvesting its revenues into the operations of its hospital facility. Community spends a substantial amount of money each year for property and equipment.

For the years 1992 to 1995 combined, Community spent approximately $17,000,000 on property and equipment. As found by the County's auditor, for the five year period ending on June 30, 1994, ninety percent of the hospital's cash was used on purchases of property, plant, and equipment.

Community asserts that, based on the above, it is maintained by charity and, thus, qualifies for an exemption from the real estate tax. The County responds that, comparing the contributions Community receives to its annual expenses, which ranged between approximately $44,000,000 to $50,000,000 per year from 1992 to 1995, the contributions are unnecessary to the operation of the hospital. In the County's view, Community is supported by patient revenues, and not charity.

Community, however, has demonstrated that it has consistently received meaningful contributions since the 1980s, and that it has reinvested its surplus income into its facility. Although the amount of its contributions might appear to be small compared to Community's total expenses, we believe those contributions are sufficient to show that Community is partially supported by charity. *See Mt. Macrina Manor* (although the institution had a total revenue of $4,600,000 during the fiscal year ending in June of 1995, the fact that it received only $43,000 in charitable donations was sufficient to show that the institution was partially supported by charity). Furthermore, merely because Community depends on patient revenues, much of which is collected from Medicare and Medicaid, does not preclude it from being maintained by charity, considering that it reinvests its monies into the hospital. *St. Margaret Seneca.*

Therefore, we conclude that Community is maintained by charity and, accordingly, hold that it qualifies for an exemption from the real estate tax under Section 204 of the Law.[5]

5. Governor Tom Ridge recently signed into law the Institutions of Purely Public Charity Act (Act), Act of November 26, 1997, P.L. ____, No. 55, which has enacted extensive legislative changes under the provisions of Article 8, Section 2(a)(v) of the Constitution, which provides:
(a) The General Assembly may by law exempt from taxation:

## CONCLUSION

Accordingly, the May 24, 1996 order of the Common Pleas Court, which determined that Community was not a purely public charity, is hereby reversed. However, the order of Common Pleas dated March 23, 1995, which granted, in part, Community's "Petition to Remove Property from the Assessment Rolls and to Strike Tax Assessment," is hereby affirmed.

## ORDER

NOW, January 26, 1998, the May 24, 1996 order of the Common Pleas Court of Dauphin County in the above-captioned matters is hereby reversed. The Common Pleas Court's March 23, 1995 order in the above-captioned matters is hereby affirmed.

. . . .
(v) Institutions of purely public charity. . . .
Although Section 16 of the Act provides that its major provisions will take place immediately, they have no effect on the tax years at issue in this case.