709 A.2d 928 (1998)
SAINT JOSEPH HOSPITAL, Appellant,
v.
BERKS COUNTY BOARD OF ASSESSMENT APPEALS, Borough Mount Penn, City of Reading, Pennsylvania, and the School District of the City of Reading, Pennsylvania and the Antietam School District.
Commonwealth Court of Pennsylvania.
Argued April 17, 1996.
Decided January 26, 1998.
*929 Mary E. Kohart, Philadelphia, for appellant.
John W. Beatty, Erie, for appellees, City of Reading and the School District of City of Reading.
Before COLINS, President Judge, and DOYLE, SMITH, FRIEDMAN, KELLEY and FLAHERTY, JJ.
DOYLE, Judge.
Saint Joseph Hospital (SJH) appeals an order of the Court of Common Pleas of Berks County, which affirmed a decision of the Berks County Board of Assessment Appeals to discontinue SJH's charitable exemption from local real estate taxes.

*930 FACTUAL HISTORY

We will discuss the factual background by dividing it into three subparts: the history and intricate corporate structure of SJH and its affiliates; the charitable services and financial situation of SJH; and the procedural history of this litigation.

I. History and Corporate Structure of SJH
SJH is a non-profit corporation located in Reading, Pennsylvania. It was founded in 1872 by Monsignor George Bornemann and began operating on August 22, 1873. Monsignor Bornemann arranged for SJH to be operated by the Sisters of Saint Francis (the Sisters), a religious order of Catholic women whose primary mission has been service to the poor. In 1890, community leaders formed a board of management to assist the Sisters in operating the hospital. That board is extant in the form of SJH's Board of Trustees, an administrative body composed of members of the Reading community and members of the Sisters. The deed to SJH was given to the Sisters in 1895.
SJH is one of eleven hospitals across the United States operated by the Sisters. In 1981, the Sisters formed the Franciscan Health System (FHS), a non-profit corporation which is exempt from the federal income tax, to control their hospitals from a central corporation.[1] Thereafter, the Sisters established two regional service corporations to act as the sole corporate member of hospitals within their territory: Franciscan Health Service Northwest (the sole corporate member of FHS's hospitals in the western United States); and Franciscan Healthcare Corporation (FHC) (the sole corporate member for FHS's hospitals in the eastern United States). FHS is the sole corporate member of each of the two regional service corporations. While FHC is described as the sole corporate member of SJH, it is not clear from the record whether FHC "owns" SJH; nor is it clear what role, if any, FHC plays in the operation of SJH.
The trial court found that FHS, not FHC, exerts considerable control over the operation of SJH. Specifically, FHS approves SJH's budget, approves certain decisions regarding capital expenditures, and hires and pays SJH's chief executive officer. FHS also controls SJH's Board of Trustees because a large percentage of the Trustees are members of the Sisters of St. Francis.[2] Further, SJH purchases management services from FHS, namely, materials management, debt management, treasury management and cash development management services. In 1990 and 1991, SJH paid FHS $617,754 in management fees for the above services; this sum is large, but the arrangement saves SJH money because such services would be more expensive if they were purchased on the open market. At times, SJH has declined management services offered by FHS. FHS also controls the Neumann Insurance Company which sells malpractice insurance to SJH.
In 1982, SJH formed the Saint Joseph Development Corporation to raise funds on its behalf. SJH, however, later renamed that corporation the Bornemann Health Corporation (Bornemann)[3] and expanded its role to include the development of business enterprises that would allow SJH to provide health care services beyond the boundaries of the hospital. In its new role as business developer, Bornemann acquired and operated *931 physician's practices, urgent care centers, and a medical equipment company. Ownership of the medical equipment company was transferred to a for-profit subsidiary corporation of Bornemann, SJH Services Corporation. Bornemann employs the physicians associated with SJH and thereby reduces administrative costs, particularly those costs involved in billing Blue Cross and Blue Shield. It also owns physician practices affiliated with SJH and pays the salaries of the doctors employed by those practices. Furthermore, Bornemann operates the Doctor's Convenient Care Center, a medical clinic designed to draw patients from high cost emergency rooms. SJH elected to operate the clinic through Bornemann, because it facilitates reimbursement of fees from Blue Shield. It also owns and operates the Saint Joseph Living Center, a provider of assisted living services.
The for-profit subsidiary of Bornemann, SJH Services Corporation, was, in 1989, restructured as a subsidiary of Franciscan Services, Inc. (FSI), a for-profit corporation owned and controlled by FHS. In addition to running SJH Services, FSI's primary business purpose was establishing a health maintenance organization to benefit all of the hospitals associated with FHS, including SJH.
SJH further operates a physical therapy clinic located in the Borough of Mount Penn, Pennsylvania. SJH operates several outreach centers, the St. Elizabeth Women's Wellness Center, the Family Practice Health Center, the Fifth Street Family Health Clinic, and a drug and alcohol treatment center, all intended to serve the poor.
The corporate structure described above, is represented in the following organizational chart:

*932 II. Charitable Services and Finances of SJH
No patient has ever been turned away from SJH because of an inability to pay; nor has any patient ever been forced to wait for treatment pending a determination of that person's ability to pay. SJH accepts uninsured patients, generally members of the social class referred to as the working poor (people with too great an income for Medicaid but so little income that they cannot afford to purchase private health insurance), and takes its chances on a patient's payment of medical bills. It does not attempt to recover unpaid medical bills by lawsuit or file reports with credit bureaus.
SJH provides services and programs to the poor under the terms of its charity care policy, which requires SJH to "provide health care to each person regardless of religious belief, age, race, sex, sexual orientation, physical and intellectual capacity, and economic status." (Trial Court Opinion, Finding of Fact No. 14.) SJH policies also require it to devote a minimum of 2% of its net operating revenues to charity care. Pursuant to those policies, SJH provided $2,331,000 of charity care in the fiscal year of 1993. Adding an additional $2,115,000 in unpaid medical debts of the working poor and uninsured, which debts SJH refuses to pursue, to the amount of its pure charity care, SJH dispensed a total of $4,446,000 of charity care in the fiscal year of 1993.
During fiscal year 1993, SJH provided the following specific types and amounts of charity care: (1) $237,000 in free care to eligible patients; (2) $1,079,000 in unreimbursed Medicaid treatment; and $63,000 in donated material such as blankets and beds. The outreach facilities owned by SJH provide additional charitable services to the community. Together, those facilities serve 45,000 patients each year, dispensing services without regard to the patient's ability to pay. In the fiscal year 1993, the outreach clinic gave the community a benefit of $729,000.
While SJH has invested substantial funds into charity care, during the years 1980 through 1992, it nevertheless realized an excess of revenues over expenses. Those revenues were devoted exclusively to the ongoing operations of the hospital; during the time period at issue, SJH made significant investments in its physical facilities by replacing equipment and by improving hospital operation. SJH has capital expenditures and debt service obligations, and, in 1993, the cost of those investments and debts exceeded SJH's net revenues (plus depreciation and amortization) by $2,565,000.
The total income of SJH's president earned in 1991 was $171,650 (salary and bonuses). In 1991, salaries for SJH's officers are as follows: vice president of patient services, $41,969; vice president of medical affairs, $72,116; chief financial officer, $81,898; vice president of human resources, $75,851; vice president for development, $86,297; senior vice president, $95,955. SJH also pays its executives bonuses, which are paid in return for advances in cost containment and quality improvement. The maximum bonus in 1991 for department heads was $4,000 (15% for senior management, and 30% for the president).

III. Procedural History
SJH had a charitable exemption from the real estate tax since its creation in 1872. However, on or about August 22, 1991, the City of Reading and the School District of Reading submitted an appeal to the Berks County Board of Assessment Appeals (Board) challenging the tax exempt status of SJH's real property, located at six addresses in the City of Reading, and requesting that those properties be returned to the tax rolls. The Borough of Mount Penn and Antietam School District challenged the tax exempt status of one property within their borders, where SJH's physical therapy clinic is located. The Board conducted a hearing and, thereafter, determined that SJH was no longer entitled to tax exempt status and, therefore, all seven properties at issue were subject to the real property tax.
SJH appealed the Board's decision to the Common Pleas, and the trial court conducted hearings in June of 1994. To determine whether SJH was a purely public charity, the trial court applied the test in Hospital Utilization Project v. Commonwealth, 507 Pa. 1, *933 487 A.2d 1306 (1985) (HUP), wherein the Supreme Court identified the following five factors to be considered when determining whether a particular organization qualifies as a purely public charity:
(a) Advances a charitable purpose;
(b) Donates or renders gratuitously a substantial portion of its services;
(c) Benefits a substantial and indefinite class of persons who are legitimate subjects of charity;
(d) Relieves the government of some of its burden; and
(e) Operates entirely free of the profit motive.
Id. at 22, 487 A.2d at 1317. In determining whether SJH operated entirely free of the profit motive, the trial court examined the relationship between SJH and all of its related corporate entities, utilizing the following analytical framework:
We conclude that Entity A cannot be operated entirely free from a private profit motive if it:
(1) is owned and controlled by Entity B;
(2) does business with Entity B; or
(3) does business with Entity C when Entity C is owned or controlled by Entity B, unless Entity B and Entity C each devote all their income and profit to public charitable purposes.
An entity cannot own or control an organization which would otherwise be a public charity and use that organization to enhance its sales or increase its revenues, even if its charges are fair and reasonable and usual and customary in the area in which it does business and its profits are fair.
(Trial Court Opinion at 21.) (Emphasis added.)
On June 28, 1995, Common Pleas issued a decision holding that SJH was not an institution of purely public charity entitled to a charitable exemption from the property tax. The trial court concluded that SJH satisfied the first four elements of the HUP test; however, the trial court found that SJH did not prove that it was operating free of the private profit motive. Applying the test it developed, the trial court concluded SJH failed to show that all of the corporate entities controlled by FHS are purely public charities or devote their profits to public charitable purposes and, thus, did not sustain its burden of proof. This appeal followed.

ISSUE PRESENTED
SJH raises the following issue for our review:
When a hospital presents evidence which is accepted by the trial court that shows it operates entirely free from private profit motive, should that hospital be denied exemption from real property taxes on the grounds that it does not operate entirely free from private profit motive because it is an indirect affiliate of another tax-exempt, non-profit umbrella organization ... and it did not present evidence to establish that the umbrella organization operates the hospital without a private profit motive?
(SJH's Brief at 3.) In addition to the above issue, the City of Reading and School District of Reading (collectively referred to as Reading) "assert" in their brief that this appeal is interlocutory order of the Common Pleas Court.

DISCUSSION

Is this an Appeal of an Interlocutory Order?
Because this issue impacts on our jurisdiction to decide this appeal, we will first consider the argument raised in Reading's brief that SJH is appealing an interlocutory order. After SJH filed the instant appeal, the trial court drafted a supplemental memorandum opinion in which it asserted that this Court should quash SJH's appeal as interlocutory. Reading's argument is based on that opinion which reads,[4] in pertinent part, as follows:

*934 [T]he hospital appealed from the Board's decision to discontinue the hospital's local real estate tax exempt status and from the County's valuation of the property owned by the hospital. The two issues were bifurcated and this Court heard evidence on the tax exempt status issue only. The issue of valuation has not been heard and remains undecided. Therefore, the Order of June 28, 1995 did not end the litigation or dispose of the entire case, and is interlocutory.... Therefore, the instant appeal should be quashed as interlocutory.
(Memorandum Opinion, 9/8/95, at 2.) (Citation omitted.) (Emphasis in original.)
In order to appeal to this Court as a matter of right, a party generally must take an appeal from a final order as defined by Pa. R.A.P. 341.[5] A final order is an order that: (1) disposes of all claims or all parties, (2) an order expressly defined by statute as final, or (3) an order that does not resolve all claims in a case, but which nevertheless expressly determines that an immediate appeal would facilitate resolution of the entire case. Pa. R.A.P. 341.
Bifurcation refers to the power of a trial court to regulate the order of proof in a case by severing the various issues raised and conducting separate trials on each issue. Swanger v. Pyles, 204 Pa. Superior Ct. 72, 203 A.2d 488 (1964). Contrary to the trial court's opinion, our review of the record does not reveal that SJH filed a single statutory appeal which was bifurcated into separate trials, one to resolve the issue of SJH's tax exempt status and one concerning the tax or fair market value of SJH's real property. Instead, the record shows that those issues are being raised in entirely separate cases, filed in different years, and under different docket numbers. The case involving the Board's order revoking SJH's charitable tax exemption was filed on September 24, 1992, and docketed at No. 5021-92 AD. The issue regarding the assessed value of SJH's property, however, is at issue in two different appeals, namely, No. 2281-93, filed on May 6, 1993, and No. 360-94, filed on January 24, 1994. Therefore, because the order challenged in this appeal decided a single case, which was not consolidated with related cases pending before the trial court, and resolved all claims raised in that case, it is a final order as defined by Pa. R.A.P. 341.

Did the Trial Court Err in Holding that SJH was not a Purely Public Charity Entitled to an Exemption From Real Estate Taxes?
Article 8, Section 2 of the Pennsylvania Constitution gives the General Assembly the power to exempt institutions of purely public charity from taxation. The General Assembly, based on that grant of authority, enacted Section 204 of the General County Assessment Law (Law),[6] which grants a real estate tax exemption to purely public charities. In order to qualify as a public charity under Section 204 of the Law, the institution must first satisfy the test articulated in HUP. The taxpayer bears the burden of proving that it is entitled to the exemption and must satisfy all five criteria of the HUP test to qualify as an institution of purely public charity. Associated YM-YWHA of Greater New York/Camp Poyntelle v. County of Wayne, 149 Pa.Cmwlth. 349, 613 A.2d 125 (1992).
In addition, an applicant must satisfy Section 204(a)(3) of the Law, 72 P.S. § 5020-204(a)(3), which provides the following standard for tax exempt real property:
(a) The following property shall be exempt from all county, city, borough, town, township, road, poor, and school tax, to wit:
....
(3) All hospitals ... founded, endowed, and maintained by public or private charity: Provided, That the entire revenue derived by the same be applied to the support and to increase the efficiency and *935 facilities thereof, the repair and the necessary increase of grounds and buildings thereof, and for no other purpose ...
72 P.S. § 5020-204(a)(3).
The only element of the HUP test at issue in this appeal is whether SJH operates entirely free of a profit motive. The trial court determined that SJH satisfied all the other elements of the HUP test and, because none of the Appellees in this appeal dispute that SJH satisfied those elements or have filed a cross appeal challenging that determination, we will not revisit those determinations.
In order to decide the issue raised by SJH, we must first determine whether the trial court erred in holding that the corporate siblings of SJH must also devote their profits to charitable purposes, and, if the court so erred, we must then decide whether SJH met its burden of proving that it operates free of the profit motive.
In Sacred Heart Healthcare System v. Commonwealth, 673 A.2d 1021 (Pa.Cmwlth.1996), we held that a health care management corporation could not qualify as a purely public charity based on the charitable works of related corporate entities. We stated:
[Sacred Heart Healthcare System referred to as] SHHS[,] is a non-profit corporation, formed on November 23, 1984, and, as such, is an independent entity. Lycoming County Nursing Home Association, Inc. v. Department of Labor and Industry, Prevailing Wage Appeal Board, 156 Pa.Cmwlth. 280, 627 A.2d 238 (1993). Where a taxpayer divides itself into separate corporate entities, the taxpayer cannot insist that the Commonwealth ignore those distinct legal entities so as to find that it is something that it is not. Commonwealth v. Weldon Pajamas, Inc., 432 Pa. 481, 248 A.2d 204 (1968). Thus, including the functions of SHHS's sister corporations in our analysis would require us to disregard the fact that SHHS is an independent entity. Moreover, the Hospital created SHHS and the other affiliated corporations because that organizational structure operates to its advantage by improving the Hospital's efficiency, increasing its medicare/medicaid reimbursement, and its potential for bond financing. We will not disregard the fact that SHHS is an independent entity merely because, in this situation, that organizational form works to the disadvantage of SHHS. Sams v. Redevelopment Authority, 431 Pa. 240, 244 A.2d 779 (1968).
Further, in Appeal of the Northwestern Corporation from the Dauphin County Board of Assessment Appeals, 665 A.2d 856 (Pa.Cmwlth.1995), this Court rejected a taxpayer's argument that, for purposes of determining whether the taxpayer was entitled to a charitable exemption from the property tax, the activity of an independent subsidiary corporation, not located on the parcel of land at issue, should be considered along with the activities of the taxpayer. We held that including the activities of a separate and distinct corporate entity in the analysis was illogical because the property tax issue concerned only the activities of the taxpayer on the parcel of land subject to taxation. In our view, it is just as illogical to consider the operations of multiple corporations when determining a single corporation's right to a charitable tax exemption, as it was in Northwestern to look beyond the activities conducted on the single parcel of land in question.
Id. at 1025. Under the above reasoning, we concluded that, when determining whether the hospital satisfied the elements of the HUP test, only the activities of the corporation applying for the charitable exemption would be considered, so long as it was the corporation's real property that was at issue.
In our view, the reasoning in Sacred Heart controls the instant case, and we reject the trial court's analysis requiring an applicant for a charitable tax exemption to demonstrate that any and all related corporations are also charities or donate all of their profits to charitable purposes. SJH is an independent corporate entity, and, when determining whether it was entitled to a real estate tax exemption under the HUP test, the trial court's analysis should have focused on the activities of SJH. Just as one corporate entity cannot qualify for a charitable tax exemption based on the good works of related entities, Sacred Heart, a separate corporate entity may not be denied such an exemption *936 solely because its corporate siblings do not themselves qualify as charities. The profit or non-profit status of SJH's sister corporations, by itself, is not controlling as to the question of whether SJH satisfied the HUP test and was a purely public charity entitled to an exemption from the real property tax.
The case presented in this appeal is not a case where the institution claiming the charitable exemption has funded the profit-making endeavors of other corporate entities through a cash flow scheme of channeling its excess revenues through the corporate parent and to its corporate siblings. See Pinnacle Health Hospitals, Successor by Merger to Harrisburg Hospital v. Dauphin County Board of Assessment Appeals, 708 A.2d 1284 (Pa.Cmwlth., 1998); Pinnacle Health Hospitals, Successor to Consolidation to Polyclinic Medical Center, 708 A.2d 845 (Pa.Cmwlth., 1998). The controlling principle which we now articulate is a constantnamely, that the focus of judicial inquiry will hereafter be on the activities of the institution itself, and those activities will include all of its corporate activities which would include, where appropriate, the diversion of its excess revenues to non-charitable and/or for-profit activities. A charitable institution cannot be the financial engine which pulls for-profit freight and remain an institution of purely public charity.
While the charitable or non-charitable status of related corporations alone may not determine whether an organization qualifies for a charitable exemption, the financial connection between the organization and its sister corporations is, in an appropriate case, of course, highly relevant. In Harrisburg Hospital and Polyclinic Hospital, the record showed that those institutions transferred millions of dollars, during years relevant to taxes at issue, to related corporations which exhibited a profit motive. We held in those cases that the diversion of surplus monies by Harrisburg Hospital and Polyclinic into other entities that were not operated free of the profit motive was evidence that those hospitals themselves were not operated free of a profit motive. Accord School District of the City of Erie v. Hamot Medical Center, 144 Pa.Cmwlth. 668, 602 A.2d 407 (1992) (Hamot did not operate free of the profit motive when, among other things, it transferred $25,000,000 over eight years, to related corporations, which then invested a substantial portion of that money into for-profit real estate investments).
Accordingly, the trial court erred in holding that SJH could not qualify for a charitable tax exemption, because it failed to prove that its related corporations were also charitable entities.
The trial court's reasons for denying the exemption, however, were not limited to SJH's failure to prove that its related corporations were also charities. The court also concluded that the charitable status of FHS was relevant to SJH's qualifications as a purely public charity, because FHS, "in effect," had "complete" control over SJH and that SJH was not an independent corporate entity.[7] The issue of a parent corporation's control over a subsidiary corporation, under the analysis in Sacred Heart, is relevant, in our view, only if the degree of control exercised by the parent corporation is so substantial that the subsidiary corporation is, in reality, not a bona fide independent corporation. In this regard, we find the equitable principles and legal criteria utilized in determining whether to "pierce the corporate veil" in other areas of the law to be useful.
Pennsylvania law allows the corporate form to be disregarded in situations where there is gross undercapitalization, failure to adhere to corporate formalities, substantial intermingling of personal and corporate affairs, and the use of the corporate form to perpetrate a fraud. Longenecker v. Commonwealth, 142 Pa.Cmwlth. 130, 596 A.2d 1261 (1991), petition for allowance of appeal denied, 531 Pa. 656, 613 A.2d 561 (1992). And, where a parent corporation dominates a subsidiary corporation to the degree that it is a mere instrumentality or sham corporation, the corporate existence of *937 the subsidiary may be disregarded. Botwinick v. Credit Exchange, Inc., 419 Pa. 65, 213 A.2d 349 (1965). In the present case, the trial court found that FHS controlled SJH based on the following facts: FHS is the sole corporate member of FHC which, in turn, is the sole corporate member of SJH; FHS controls SJH's Board of Trustees by having the Sisters comprise a large percentage of its membership; FHS approves SJH's budget and certain decisions regarding capital investments; and FHS hires and pays SJH's Chief Executive Officer. Critically, the trial court did not find as a fact that SJH was not a bona fide corporation, that it had no independent decision making power at all, or that its corporate status should be disregarded. None of the factors in Longenecker are present in this case, and, while FHS has enormous control over SJH, the facts here do not indicate that SJH is so dominated by FHS that its very existence is reduced to a mere sham. Therefore, regardless of the fact that FHS has considerable control over SJH, because SJH is a corporation separate and distinct from FHS, it is the tax exempt status of SJH alone which is at issue in this appeal.
We next turn to the issue of whether, based on its own activities, SJH operates entirely free of the profit motive. To determine if an organization is free of the profit motive, this Court looks to, inter alia, whether the organization made a profit or whether excessive salaries and fringe benefits are paid to corporate officers. St. Margaret Seneca Place v. Board of Property Assessment, Appeals & Review of Allegheny County, 536 Pa. 478, 640 A.2d 380 (1994); Sacred Heart. And, after an exhaustive review of the record in this case, we conclude that it demonstrates that SJH does operate entirely free of the profit motive.
The facts found by the trial court show that from 1980 to 1992 SJH realized an excess of revenues over expenses. But, the facts also show that all of the excess revenues were reinvested into the hospital to increase its efficiency and to improve its facilities. In St. Margaret Seneca Place, our Supreme Court held that where an institution realizes a surplus of funds and reapplies those monies to the maintenance of the facility, that surplus is not private profit. Under St. Margaret Seneca Place, therefore, SJH's excess revenues are not deemed to be "profits." Moreover, SJH's excess revenues are offset by expenditures on debt service and capital investments, and in 1993 those expenses exceeded SJH's surplus by $2,565,000.
Further, the salaries paid to SJH's officers range from $41,000 to $96,000. The president of SJH, when bonuses are added to his salary, earned a total income of $171,650 in 1991. The trial court correctly noted that those salaries are not excessive when compared to salaries for similar positions in the business world. Palpably those salaries are not so high as to indicate that SJH is hiding profits by disbursing them to corporate officers.
The trial court findings of fact do not show that monies from the hospital are being continuously transferred from the Hospital to related for-profit corporations. While the court's findings reveal that SJH made a single, but substantial, investment of 1.6 million dollars into a for-profit entity, FSI, in 1988, the hospital surrendered its stock in 1991 after that business enterprise failed. In the absence of any other investments in for-profit entities, we do not believe that a single transfer of monies to a for-profit corporation in 1988, which investment has since been liquidated, is sufficient to demonstrate that SJH has a profit motive. See Community General Osteopathic Hospital v. Dauphin County Board of Assessment Appeals, 706 A.2d 383 (Pa.Cmwlth.1998).
Therefore, we hold that SJH has satisfied every element of the HUP test and, hence, is a purely public charity.

Is SJH entitled to a tax exemption under Section 204(a)(3) of the Law?
Although SJH is a purely public charity under HUP, to qualify for an exemption from the real estate tax, it must nonetheless also satisfy the requirements of Section 204 of the Law. The party seeking such an exemption bears a heavy burden of proving that it is deserving of a tax exemption, *938 Appeal of Capital Extended Care, 148 Pa.Cmwlth. 128, 609 A.2d 896 (1992), and tax exemption statutes, like Section 204 of the Law, must be strictly construed. Section 1928(b)(5) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1928(b)(5). While the trial court did not consider Section 204 of the Law, in light of its conclusion that SJH failed the HUP test, the Court's findings of fact are sufficient for us to address this issue and, accordingly, we need not remand this matter.
Section 204(a)(3) establishes three criterion for determining if a charity qualifies for a tax exemption: (1) the institution must be one of purely public charity; (2) it must have been founded by public or private charity; and (3) it must be maintained by public or private charity. Woods Schools Tax Exemption Case, 406 Pa. 579, 178 A.2d 600 (1962).
There is no dispute in this case that SJH was founded by charity, and we have held that SJH is a purely public charity. The unresolved question is whether SJH is maintained by charity. We hold that it is.
Generally, in order to find that an institution is maintained by charity, the institution must show that it receives significant charitable contributions. The Couriers-Susquehanna, Inc. v. County of Dauphin, 693 A.2d 626 (Pa.Cmwlth.1997) (Couriers II). However, an institution need not be fully funded by charitable contributions to be deemed to be maintained by charity. Mt. Macrina Manor, Inc. v. Fayette County Board of Assessment Appeals, 683 A.2d 935 (Pa.Cmwlth.1996). So long as an institution is partially funded by charity and any surplus revenues which it receives are used to operate the facility or are placed in a surplus fund for future use, the institution is maintained by charity. Id.; West Allegheny Hospital v. Board of Property Assessment Appeals and Review of Allegheny County, 500 Pa. 236, 455 A.2d 1170 (1982) (where an institution had revenues derived from patient billings and reinvested those funds in the charity's facilities, the institution was supported and maintained by public charity).
Here, the trial court found that SJH has been receiving charitable contributions from various sources throughout its entire history. The record shows that, from 1987 through 1991, SJH received annual contributions ranging from a low of $224,000 to a high of $928,000. SJH also has a capital campaign that raised 2.5 million dollars in pledges. Further, in 1991 alone SJH received the equivalent of $330,000 in volunteer services; if those services were not donated, the trial court found, SJH could not operate in the manner that it does. Based on all of the above, we must conclude that SJH is maintained by charity. Community General Osteopathic Hospital. Because of that conclusion we, therefore, also hold that SJH qualifies for a tax exemption under Section 204 of the Law.
In a related matter, the Antietam School District (Antietam) asserts that, even if SJH qualifies as a purely public charity entitled to a tax exemption, SJH is not entitled to a real estate tax exemption for its physical therapy clinic, which is located within Antietam's borders. Antietam argues that the clinic is a profit-making institution and serves no charitable purpose, and that, even if we determine that the Reading properties are tax exempt, SJH is entitled to a "partial exemption" only. We disagree.
Antietam's claim that the physical therapy clinic serves no charitable purpose is outside the scope of the issue crafted by the appellant, SJH, and cannot be raised by Antietam in its role as appellee. Even so, with regard to Antietam's allegations, the trial court found as a fact that the physical therapy clinic is part of the SJH's physical medicine department and has the same open admission policies as SJH. Nothing in the record indicates that the clinic operates for a profit and, moreover, the clinic does not even have a budget separate from the physical medicine department of the hospital or from SJH. Based on the fact that the SJH demonstrated that it is a purely public charity entitled to a tax exemption, as well as the fact that the clinic is not financially distinct from SJH, we conclude that the clinic is also tax exempt.[8]

*939 CONCLUSION

Accordingly, because SJH is a purely public charity and entitled to a tax exemption, we reverse the trial court's order.

ORDER
NOW, January 26, 1998, the order of the Court of Common Pleas of Berks County in the above-captioned matter is hereby reversed.
PELLEGRINI, J., did not participate in the decision in this case.
NOTES
[1] Of FHS's top managers, only one, the senior vice president for mission and ministry, is a member of the Sisters. FHS has a sixteen-member Board of Directors, and, of that group, eight are members of the Sisters. (1991 Internal Revenue Service Form 990, Exhibit 2 at 1-2; Reproduced Record (R.R.) at 703a-04a.)
[2] The supplementary statements attached to SJH's 1991 Tax Exempt Organization form, Form 990, filed with the Internal Revenue Service lists seventeen persons as "directors." Of that number, five are nuns; three of the nuns are specifically noted as being members of the Order of St. Francis. (Internal Revenue Service Form 990, Supplementary Statement V at 1-2; R.R. at 726a-27a.)
[3] Although FHC is the sole corporate member of Bornemann, the record shows that two of Bornemann's top three managers and three of its five directors are also managers or directors of SJH. This arrangement places de facto control of Bornemann in the hands of SJH and, ultimately, FHS.
[4] In its brief, Reading's entire argument on this issue consists of a single sentence: "Finally, Reading submits that the trial judge was also correct in concluding that the within appeal was interlocutory." (Reading's Brief at 16.) While such a poor development of an argument would normally result in its waiver, because this issue impacts on our jurisdiction to decide this appeal, Hoover v. Bucks County Tax Claim Bureau, 44 Pa.Cmwlth. 529, 405 A.2d 562 (1979), we shall consider it.
[5] There is a limited class of interlocutory orders which may be appealed as of right under Pa. R.A.P. 311, and collateral orders may be appealed as of right under Pa. R.A.P. 313.
[6] Act of May 22, 1933, P.L. 853, as amended, 72 P.S. § 5020-204.
[7] SJH argues that the trial court's finding that SJH was controlled by FHS is not supported by substantial evidence. That issue, however, was not raised or suggested in the "Statement of Questions Involved" portion of SJH's brief and, therefore, is waived. Pa. R.A.P. 2116(a).
[8] Governor Tom Ridge recently signed into law the Institutions of Purely Public Charity Act (Act), Act of November 26, 1997, P.L. ____, No. 55, which has enacted extensive legislative changes under the provisions of Article 8, Section 2(a)(v) of the Constitution, which provides:

(a) The General Assembly may by law exempt from taxation:
....
(v) Institutions of purely public charity....
Although Section 16 of the Act provides that its major provisions will take place immediately, they have no effect on the tax years at issue in this case.