**[J-48-2024] [MO: Todd, C.J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| POTTSTOWN SCHOOL DISTRICT | : | No. 95 MAP 2023 |
| | : | |
| | : | Appeal from the February 10, 2023 |
| v. | : | Order of the Commonwealth Court at |
| | : | No. 1217 CD 2021 Reversing the |
| | : | October 8, 2021 Order of the |
| MONTGOMERY COUNTY BOARD OF | : | Montgomery County Court of |
| ASSESSMENT APPEALS, POTTSTOWN | : | Common Pleas, Civil Division, at |
| HOSPITAL, LLC, POTTSTOWN | : | Nos. 2017-27756, 2017-27758, and |
| BOROUGH AND COUNTY OF | : | 2017-27783. |
| MONTGOMERY | : | |
| | : | ARGUED:  September 10, 2024 |
| | : | |
| APPEAL OF: POTTSTOWN HOSPITAL, | : | |
| LLC | : | |

**DISSENTING OPINION**

**JUSTICE MUNDY**                                    **DECIDED:  May 30, 2025**

The Pennsylvania Constitution empowers the General Assembly to create tax exemptions for institutions of "purely public charity."  PA. CONST. art. VIII, § 2(a)(v).  Our judicially-created standard delimiting that authority states that to qualify as such, an institution must be operated "entirely" free from a private profit motive.  This is the fifth element of the so-called *HUP* test,[1] and it is the only element at issue in this case.[2]

There is nothing wrong with earning a profit.  The profit motive is in substantial measure the engine that drives our economy, its complexity, its innovations, and its productivity.  In a free and competitive market, profits are the fruit of other-directedness,

---

[1] *See Hosp. Utilization Project v. Commonwealth*, 487 A.2d 1306, 1317 (Pa. 1985), *quoted in* Majority Op. at 6.

[2] *See Pottstown Sch. Dist. v. Montgomery Cnty. Bd. of Assessment Appeals*, 305 A.3d 959 (Pa. 2023) (*per curiam*) (listing issues accepted for review).

the production and supply of goods and services more valuable to others than the money they part with. But under ordinary English usage, modifiers along the lines of "purely" and "entirely" allow for no profit motive at all if an organization wishes to be excused from the ordinary tax burden shouldered and shared by everyone else. The central question raised herein is: where earnings-based financial incentives are widely used throughout an industry to compensate high-level executives, can a corporation that uses such incentives – with the result that the executives receive million-dollar yearly compensation packages that include bonuses for financial performance – properly qualify as a purely public charity entitled to a tax exemption?

Before considering that question in light of the executive salaries and bonuses, I initially, and respectfully, differ with the majority's conclusion that Tower's finances should be excluded from view. Such exclusion is not dictated by Article VIII, Section 2(a)(5) of our organic law, and in assessing whether a particular organization is carrying on a business for gain or profit for tax-exemption purposes, we have traditionally looked, not only to the entity's form, but to the "substance of its structure and operation." *Sch. Dist. of Phila. v. Frankford Grocery Co.*, 103 A.2d 738, 741 (Pa. 1954). Additionally, we have stated that a court's focus in determining whether an organization satisfies *HUP*'s fifth element is, *inter alia*, whether the organization's surplus revenue inures to the benefit of any private individual related to the charity "*or related organizations*." *Wilson Area Sch. Dist. v. Easton Hosp.*, 747 A.2d 877, 880 (Pa. 2000) (emphasis added). I believe it appropriate for courts to retain the ability to detect situations where an institution would be profitable in and of itself, but its profits are absorbed by its parent corporation and inure to the benefit of certain private individuals, thereby making the institution that generates the profits appear unprofitable on paper. *Cf. Erie Sch. Dist. v. Hamot Med. Ctr.*, 602 A.2d 407 (Pa. Cmwlth. 1992) (holding that a medical center did not operate entirely free from

a profit motive where, *inter alia*, it transferred funds to related corporations which then invested those monies into for-profit real estate projects). That does not seem like a situation for which the purely-public-charity tax exemption was intended. "A charitable institution cannot be the financial engine which pulls for-profit freight and remain an institution of purely public charity." *Saint Joseph Hosp. v. Berks Cnty. Bd. of Assessment Appeals*, 709 A.2d 928, 936 (Pa. Cmwlth. 1998); *see also* Brief for *amici curiae* Wyomissing School District *et al.* at 12 (cautioning against permitting an institution that owns real property to divert revenues to a for-profit parent organization that owns no real estate, thereby avoiding property taxes while paying "eye-popping" compensation to its executives).

My suspicion is piqued in the instant case by the fact the Hospital paid large and escalating sums to Tower Health – between $4.5 million and $23.2 million *every year* – for "management and administrative services." *Pottstown Sch. Dist. v. Montgomery Cnty. Bd. of Assessment Appeals*, 290 A.3d 1142, 1154 (Pa. Cmwlth. 2023). This occurred while Tower was the Hospital's sole member, Tower had no income of its own, and all of the Hospital's revenues were deposited into Tower's checking account. *See* Majority Op. at 8.[3] These types of expenditures deserve scrutiny because the way an entity utilizes its surplus revenue, assessed in relation to the entity's purpose and its method of fulfilling that purpose, factors into the analysis under the fifth prong of the *HUP* test. *Accord Phoebe Servs. v. City of Allentown*, 262 A.3d 660, 670 (Pa. Cmwlth. 2021) ("[T]he diversion of surplus monies into other entities that have a profit motive is evidence of a

---

[3] In the companion cases involving three Chester County hospitals, *see infra* note 7, the trial court concluded Tower was, during the relevant period, "draining huge sums of money from the individual hospitals which resulted in the hospitals showing a large net loss." *In re: Appeal of Brandywine Hosp., LLC, et al.*, Nos. 17-11220 *et al.*, *slip op.* at 10 (C.P. Chester Oct. 14, 2021), *appeal dismissed*, 291 A.3d 467 (Pa. Cmwlth. 2023); *cf. id.* at 13 ("Tower Health does not generate or have revenue in its own right. Whatever money it receives is through a series of charges levied against each hospital.").

profit motive."). Under *Wilson Area School District*, to satisfy *HUP* the hospital must expend such revenues with the expectation of receiving a reasonable return or nonmonetary benefit or otherwise to advance the entity's eleemosynary nature, and those revenues must not inure directly or indirectly to the benefit of any private individual related to the entity or to affiliated organizations. *See Wilson Area Sch. Dist.*, 747 A.2d at 880, *summarized in* Majority Op. at 19. I am uncertain how we can determine if that standard was satisfied without knowing at some level the nature of the services for which the Hospital paid Tower approximately $39 million over three years, and whether that constitutes a fair price for those services. Notably, in this regard, Appellant had the "affirmative burden" to prove entitlement to a tax exemption by demonstrating compliance with every element of *HUP*. *Hosp. Utilization Project*, 487 A.2d at 1312; *see also Alliance Home of Carlisle v. Bd. of Assessment Appeals*, 919 A.2d 206, 225 (Pa. 2007) (same under Act 55); *SEPTA v. Bd of Revision of Taxes*, 833 A.2d 710, 713 (Pa. 2003) (taxpayers bear the burden to establish tax-exempt status). It was thus the Hospital's burden to show it got its money's worth.

Turning to the executive salaries, the Hospital advances a market-based justification along the lines of, "We had to provide compensation packages in the 90th percentile to retain good talent." *See* Brief for Appellant at 32-36. But I am not convinced any portion of the compensation packages may be based on the Hospital's financial performance. Where the employee is already receiving a base salary in excess of a million dollars annually, or even $500,000, if there is to be a financial bonus above and beyond that, at least for a "purely public charity," should it not be predicated solely on non-monetary performance factors – such as the quality of patient care delivered, employee satisfaction and retention, and patient satisfaction? And why does the compensation package have to be better than nine-tenths of the rest of the industry in

order to obtain the needed services? The Hospital does not explain. It does argue strenuously that institutions should not be penalized for maintaining a positive bottom line. That assertion is true as far as it goes, but it fails to come to grips with the question of *how* the institution ensures its financial health. If it does so by offering incentives tied to financial performance in a way that is "typical of programs offered by other healthcare employers," Brief for Appellant at 34, then it has not demonstrated any difference between itself and a for-profit market participant. The Hospital seems, rather, to suggest we carve out an everybody-does-it exception to the general rule disallowing a private profit motive. It appears to advance that so long as the profit motive is harnessed to increase hospital efficiency by attracting top-notch executives, that does not undermine tax-exempt status because that is what other market players do.

As I emphasized above, there is nothing wrong with trying to earn a profit. Nor is there anything wrong with using a profit-based compensation scheme to attract good C-suite workers. My only point here is that it makes little sense to say that, because the market for high-level executive talent rewards profitability, hospitals may also reward profitability in the same way as a means of making sure they will continue to be well run – and still claim tax-exempt charity status based on the complete lack of a profit motive. Corporations need to pick a lane, and if they want to be tax exempt, they need to pick the charity lane – which under *HUP* means they must operate *entirely* free from a profit motive. Hence, I respectfully disagree with the majority's reasonableness standard and its allowance for some of the compensation to depend on the corporation's profitability, as long as it is not too much. *See* Majority Op. at 44 ("As a general rule, then, the greater the percentage of an executive's total compensation which is based on financial performance, the more likely it will be that the executive compensation package as a whole is unreasonable.").

We should not lose sight that an exemption from local taxation is the exception, not the rule. When a property is removed from the tax rolls, taxing authorities must curtail services or increase the millage for everyone else. *Accord* Brief for Appellee at 56. Property taxes are used largely to fund public education,[4] but they also fund municipal services on which all property owners rely, such as fire, police, and infrastructure. Although the framers of Article VIII, Section 2 undoubtedly considered this type of policy concern when drafting the provision, the constitutional authorization for charitable tax exemptions seems based, at least in part, on the concept that certain organizations that are purely charitable in nature are socially quite valuable, and making them pay taxes just like everyone else might force them to tailor back on their services or close their doors. *Cf*. Daniel G. Bird & Eric J. Maier, *Wayward Samaritans: "Nonprofit" Hospitals and their Tax-Exempt Status*, 85 U. Pitt. L. Rev. 81, 139 (2023) (describing tax exemptions as a "bargain" where governments free certain organizations from paying taxes in return for benefits given to the public). There is little doubt hospitals are socially valuable. But when community hospitals are replaced by vast corporate health systems that vertically and horizontally consolidate market share and are able to pay their executives millions of dollars per year, do they still fit the description of being a "purely" charitable mission in need of a tax exemption?[5]

---

[4] *See generally William Penn Sch. Dist. v. Dep't of Educ.*, 170 A.3d 414, 427 (Pa. 2017) (describing a legislatively-commissioned study concluding that 94% of school districts in Pennsylvania were spending less than necessary to meet academic standards).

[5] Some commentators have referenced data suggesting hospital consolidation, including the type of horizontal consolidation effectuated by Tower in this case, empowers hospitals to raise prices based on increased market power and reduced competition, uncorrelated to better quality care. *See, e.g.*, Bird & Meyer, *Wayward Samaritans*, 85 U. PITT. L. REV. at 102-03 nn.115-123 (citing, *inter alia*, *Measuring Hospital Post-Merger Effects: Developing a Standard for Antitrust Analysis*, 21 N.Y.U. J. LEGIS. & PUB. POLICY 957 (2019); *Cross-Market Mergers in Healthcare: Adapting Antitrust Regulation to Address a Growing Concern*, 102 CORNELL L. REV. 821 (2017); Nicholas C. Petris Ctr. on Health (continued…)

In the instant case, the very presence of the circuit breakers is, to my mind, powerful evidence of a profit motive. *See* Majority Op. at 9 n.6 (explaining that pursuant to the circuit breakers, absent a sufficiently profitable operating margin the executive bonuses are not paid). In the companion cases,[6] the Bucks County common pleas cogently explained:

> The hospitals argue that during the pandemic none of the incentive criteria were met and the plan was "suspended" by the "circuit breaker." The bonus compensation plan remained in place, whether paid or not. The fact that

---

Care Markets & Consumer Welfare, *Consolidation in California's Health Care Market 2010-2016: Impact on Prices and ACA Premiums* 32-36 (2018)). *But cf.* Gregory Curfman, M.D., *Everywhere, Hospitals Are Merging – But Why Should You Care?*, Harv. Health Publ'g: Harv. Health Blog (Apr. 1, 2015) (explaining that in spite of conflicting views about whether consolidation leads to higher prices, it can result in improved access to specialists and services for patients at smaller hospitals acquired by larger ones).

The AFL-CIO, as *amicus curiae*, adds that at this juncture, the vast majority of hospitals in Pennsylvania (including non-profit hospitals) have been absorbed into large, integrated health-care systems, and the net result has been reduced competition, escalating prices, limited access to health care for rural communities due to hospital closures, and an adverse impact on wages and working conditions. *See* Brief at 2, 5-6; *see also Brandywine Hosp., LLC v. Chester Cnty. Bd. of Assessment Appeals*, 291 A.3d 467, 480 (Pa. Cmwlth.), *appeal denied*, 308 A.3d 779 (Pa. 2023) (lamenting that Tower's actions in Chester County had left the Jennersville Hospital closed, the Brandywine Hospital for sale, and the Phoenixville Hospital as "little more than a skeleton").

[6] Tower's acquisition of the Hospital in this case was part of a broader market consolidation in which Tower also acquired several hospitals in Bucks County – which also paid tens of millions of dollars to Tower in "management fees." Those hospitals litigated their tax status at the same time as the Hospital here was litigating in the Montgomery County court. In those matters the Chester County court denied exempt status to the hospitals, and the Commonwealth Court disposed of all appeals on the same day it reversed the Montgomery County court in the instant dispute. In each case the intermediate court determined that the appeals should be dismissed due to a defective Rule 1925(b) statement, but it addressed the substantive issues for sake of completeness – finding in each case it would have affirmed on the merits absent the procedural defect. *See Brandywine Hosp. v. Chester Cnty. Bd. of Assessment Appeals*, 291 A.3d 467, 476 (Pa. Cmwlth. 2023); *Phoenixville Hosp. v. Chester Cnty. Bd. of Assessment Appeals*, 293 A.3d 1248 (Table), 2023 WL 1871695, at *4 (Pa. Cmwlth. Feb. 10, 2023); *Jennersville Hosp. v. Chester Cnty. Bd. of Assessment Appeals*, 293 A.3d 1248 (Table), 2023 WL 1871695, *4 (Pa. Cmwlth. Feb. 10, 2023).

the executive compensation plan was suspended only further serves to emphasize that the hospitals did not operate entirely free from a private profit motive. Contrary to the hospitals' arguments, the "circuit breaker" demonstrates that a bad year resulted in financial consequences to the executives. Whereas a good year or *a "profitable" year resulted in large payouts to selected people*.

*Brandywine Hosp.*, *supra* note 3, *slip op*. at 37 (emphasis added).[7] By straightforward logic, if a profitable year results in greater compensation, there is a profit motive.

Ultimately, then, and in relation to the specific issues resolved by the majority, I would conclude that (a) Tower's finances and its executive salaries are an appropriate consideration here, (b) Tower did not operate entirely free from a private profit motive, and (c) even if we limit our scope of review to the Hospital's finances and not Tower's, the fact that some of the compensation given to its executive team was based on financial performance, *see* Majority Op. at 10, precludes a finding that the Hospital was operated entirely free from a profit motive. Finally, inasmuch as the Hospital bore the burden to establish tax-exempt status, even absent the circuit breakers and the financial-performance-based bonuses I would conclude its tax-exempt status cannot be sustained pursuant to the *HUP* test's fifth element absent proof concerning the value the Hospital received in return for the tens of millions of dollars it provided to Tower for "management and administrative services."

As I would affirm the order of the Commonwealth Court, I respectfully dissent.

Justice Donohue joins this dissenting opinion.

---

[7] The court also cast doubt on Tower's representations concerning its operating losses – for example suggesting the bad debt write-off figures were inflated insofar as they were based on a master charge sheet with prices "pulled out of thin air," which were substantially higher than the hospital's cost to provide the service. *Id*. at 19.

In my opinion, even if that kind of loss is fictitious, it ultimately washes out if we simply look at how many millions of dollars the Hospital to paid to Tower (thus funding the Tower executives' multimillion dollar compensation packages), and whether the Hospital received its money's worth in return for those enormous sums.